IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
AIKEN DIVISION

| | | |
|---|---|---|
| Jan Day Plowden, | ) | C/A No.: 1:12-2588-DCN-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Carolyn W. Colvin, Acting | ) | |
| Commissioner of Social Security | ) | |
| Administration,[1] | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civil Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Disability Insurance Benefits ("DIB"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be affirmed.

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Fed. R. Civ. P. 25(d), Carolyn W. Colvin is substituted for Commissioner Michael J. Astrue as the defendant in this lawsuit.

I. Relevant Background

A. Procedural History

On July 28, 2009, Plaintiff filed an application for DIB in which she alleged her disability began on August 18, 2008. Tr. at 98. Her application was denied initially and upon reconsideration. Tr. at 47–48. On August 3, 2011, Plaintiff had a hearing before Administrative Law Judge ("ALJ") William F. Pope. Tr. at 24–46 (Hr'g Tr.). During the hearing, Plaintiff amended her onset date to August 30, 2009. Tr. at 32. The ALJ issued an unfavorable decision on August 18, 2011, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 12–19. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–3. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on September 7, 2012. [Entry #1].

B. Plaintiff's Background and Medical History

1. Background

Plaintiff was 54 years old at the time of the hearing. Tr. at 29. She completed high school. Tr. at 30. Her past relevant work ("PRW") was as a data entry specialist. Tr. at 42. She alleges she has been unable to work since August 30, 2009. Tr. at 32.

2. Medical History

In June 2003, Glen Douglas, M.D., diagnosed Plaintiff with fibromyalgia. Tr. at 211–13. Her primary care doctor, Leslie M. Stuck, provided treatment consisting of medications and Toradol injections. Tr. at 199, 200, 201, 203, 206, 208, 210. On March

11, 2008, Plaintiff reported severe musculoskeletal pain and fatigue preventing her from working a full week. Tr. at 199. She also reported an extremely poor energy level, extreme fatigue, and difficulty completing a work day. Tr. at 199. Treatment notes from Dr. Stuck dated September 18, 2008, state that Plaintiff's father had suffered a stroke, and she and her sister were taking care of him, "including assistance with moving, bathing, and toiletry." Tr. at 197.

On July 7, 2009, Plaintiff was "doing poorly" and reported to Dr. Stuck that she was under a great deal of stress trying to work and care for her elderly father. Tr. at 194. She complained of worsening fatigue, severe myalgias, right knee pain and swelling, and generalized pain that made it difficult to get up and dressed in the morning. *Id.* Dr. Stuck adjusted Plaintiff's medications and recommended a short-term leave of absence from work. Tr. at 194. X-rays performed in July 2009 showed degenerative changes in Plaintiff's hip and lower back, but a normal right knee. Tr. at 185–86. On August 3, 2009, Plaintiff saw Dr. Stuck and complained of generalized fatigue and malaise, bilateral hip pain, difficulty sleeping, and pain in her right elbow radiating into her right hand. Tr. at 193. On August 31, 2009, Plaintiff presented with complaints of a cold and continuing arthralgias and myalgias, and Dr. Stuck again adjusted her medications. Tr. at 191.

Plaintiff saw Deanna L. Constable, M.D., in early September 2009, for evaluation of her complaints of pain in her right knee, hip, and right arm. Tr. at 285. Dr. Constable noted that other than Plaintiff's fibromyalgia and high cholesterol, Plaintiff was healthy. *Id.* Dr. Constable advised Plaintiff that her smoking could be aggravating her

fibromyalgia pain. *Id.* Plaintiff's examination showed pain in her neck and slight swelling around her right knee, but was otherwise unremarkable. Tr. at 285–86. Dr. Constable thought Plaintiff had possible meniscal pathology in her knee, and she referred Plaintiff for further diagnostic testing. Tr. at 286. An MRI of Plaintiff's right knee demonstrated joint effusion with medial cyst, chondromalacia patella, and medial meniscal signal. Tr. at 290.

EMG and nerve conductions studies performed in October 2009 were normal. Tr. at 288. J.E. Carnes, M.D., the treating neurologist, noted that the nerve conduction study was well within normal limits and "clearly shows excellent radial, median and ulnar nerve function." *Id.* Dr. Carnes recommended conservative treatment. *Id.*

On November 16, 2009, state-agency consultant Lisa Klohn, Ph.D., completed a psychiatric review technique in which she opined that Plaintiff suffered from depression, but had no episodes of decompensation and was mildly impaired in activities of daily living ("ADLs"), social functioning, and maintaining concentration, persistence, or pace. Tr. at 253–66.

On December 1, 2009, Frank Ferrell, M.D., a state-agency physician, reviewed Plaintiff's record and opined that she could lift and carry 20 pounds occasionally and 10 pounds frequently; stand and walk for about six hours in an eight-hour workday; sit about six hours in an eight-hour workday; frequently climb ramps and stairs, balance, stoop, kneel, and crouch; occasionally crawl and climb ladders, ropes and scaffolds; and should avoid concentrated exposure to hazards. Tr. at 267–74.

Later that month, Dr. Stuck responded to questions from Plaintiff's long term disability carrier. Tr. at 292–93. Dr. Stuck stated that Plaintiff had reported worsening pain in her shoulder, neck, lower back, and legs that was making her job more difficult. Tr. at 292. Dr. Stuck further noted that there were no objective clinical findings to support Plaintiff's fibromyalgia symptoms. *Id.* Dr. Stuck also reported that Plaintiff remained on Lyrica and Tramadol, but her capacity to exercise had been limited by the development of degenerative changes in her knees. *Id.*

On January 26, 2010, Plaintiff underwent surgery on her sinuses to address her chronic sinusitis, deviated septum, and nasal obstruction. Tr. at 369–71.

When Plaintiff followed up with Dr. Constable in March 2010, she reported that her fibromyalgia limited her "moderately." Tr. at 284. Plaintiff stated that she was having more difficulty with her right hand, including swelling in her right long finger. *Id.* Dr. Constable noted that a right knee MRI did not show any meniscal pathology and an EMG/nerve conduction study was normal and she did not show any signs of peripheral neuropathy or carpal tunnel type symptoms. *Id.* With regard to Plaintiff's pursuit of disability, Dr. Constable stated that "Orthopedically, it is hard to relieve people of sedentary type duties," and left it to Dr. Stuck to opine whether Plaintiff would be able to perform sedentary work. *Id.*

In a letter dated April 30, 2010, Dr. Stuck stated Plaintiff was "totally and permanently disabled." Tr. at 291.

On May 14, 2010, Dr. Stuck's nurse practitioner, Stephanie Peterson, saw Plaintiff for complaints of urinary frequency. Tr. at 426. Ms. Peterson prescribed antibiotics for a

urinary infection. *Id.* Three days later, Plaintiff reported that her urinary tract infection was better, but she had a flare of vasculitis (inflammation of the blood vessels). Tr. at 425. Dr. Stuck assessed leukocytoclastic vasculitis (inflammation of the small blood vessels characterized by discolorations on the skin), and recommended she increase her prednisone dose. *Id.*

Plaintiff consulted with rheumatologist Kathleen Flint, M.D., on May 18, 2010. Tr. at 311. Plaintiff reported she had recently developed a rash on her legs that initially improved with prednisone. *Id.* The rash worsened after the medication was discontinued, and she had to go to the emergency room where she was treated with a high dose of prednisone. *Id.* Again, after the rash improved with prednisone, it worsened when the prednisone was tapered down. *Id.* As a result, she was on a higher prednisone dose. *Id.* Plaintiff also complained of symptoms related to menopause, "vague" headaches, occasional chest pain, and a low energy level. *Id.* Dr. Flint noted that a skin biopsy showed Plaintiff's rash was leukocytoclastic vasculitis. *Id.* On examination, Plaintiff was "healthy appearing." Tr. at 312. She had normal reflexes, intact sensation, an excellent grip strength, and full range of motion in her wrists and elbows. *Id.* Plaintiff also had full range of motion in her neck, back, hips, knees, and ankles, and an unremarkable gait. Tr. at 313. Dr. Flint assessed leukocytoclastic vasculitis, fibromyalgia, and history of back and hip arthritis and advised her to continue taking prednisone. *Id.* When Plaintiff returned to Dr. Flint a little over a week later, she reported her vasculitis was improved with medications. Tr. at 306. Dr. Flint noted that

lab testing did not show any underlying disorder and advised Plaintiff to continue the prednisone. *Id.*

In June 2010, state-agency physician Elva Stinson, M.D., opined that Plaintiff could lift and carry 20 pounds occasionally and 10 pounds frequently; stand and walk for about six hours in an eight-hour workday; sit about six hours in an eight-hour workday; frequently balance; occasionally climb ramps and stairs, stoop, kneel, and crouch; never climb ladders, ropes, and scaffolds; and not work in environments that had concentrated exposure to extreme temperatures, humidity, and environmental irritants such as fumes and gases. Tr. at 326–33.

On June 18, 2010, Dr. Flint noted Plaintiff's skin was looking much better. Tr. at 406. She decreased Plaintiff's dosage of prednisone. *Id.* A month later, Dr. Flint found Plaintiff had fibromyalgia tender points, but was healthy-appearing with a normal gait. Tr. at 403–04. Plaintiff reported that her vasculitis had improved with the prednisone, but recently flared up again after doing housework and "getting hot." Tr. at 399. Plaintiff had stopped all her pain medications because of the vasculitis, but Dr. Flint did not think her skin condition was related to her medications. *Id.* Dr. Flint noted that although it did sting, Plaintiff's rash was more problematic from a cosmetic standpoint. *Id.* She thought Plaintiff might have to choose to live with the chronic intermittent rash to get off the prednisone. *Id.* Dr. Flint instructed Plaintiff to resume taking Flexeril. *Id.*

On September 9, 2010, Plaintiff reported that her vasculitis seemed better on Colchicine (medication used to treat gout), which she had tolerated well. Tr. at 393. Plaintiff also said her fibromyalgia and sleep had improved since she went back on

Flexeril, and she took Percocet only occasionally. *Id.* Dr. Flint decreased Plaintiff's dosage of prednisone and advised her to continue her other medications. *Id.*

On October 29, 2010, Dr. Stuck found Plaintiff had full range of motion in her neck and back as well as normal sensation, muscle tone, and strength. Tr. at 421–22. Dr. Stuck advised Plaintiff to continue taking prednisone and prescribed a new medication (Savella—a pain medication) for her fibromyalgia. Tr. at 422.

On November 4, 2010, Plaintiff saw Dr. Flint and reported that her vasculitis flared when she got hot or was on her feet and that it recently flared after standing to do housework. Tr. at 387. Dr. Flint discussed Plaintiff's new prescription for Savella and recommended Plaintiff use compression panty hose in the morning. Tr. at 387.

In early January 2011, Plaintiff reported she had been able to stop taking prednisone for a month. Tr. at 381. She had experienced a recent fibromyalgia flare and Dr. Flint advised Plaintiff to restart Savella. *Id.* Dr. Flint also discussed the option of seeing a physical therapist she knew who had a special technique for fibromyalgia. *Id.*

On April 12, 2011, Plaintiff reported a recent fibromyalgia flare after her father died, although her vasculitis still seemed better with Colchicine and she was still off prednisone. Tr. at 375. Plaintiff said that she was intolerant of Savella. *Id.* Dr. Flint did laboratory testing to see if Plaintiff's vitamin D was low. *Id.* She also suggested getting a bone scan and considered having Plaintiff try Cymbalta again. *Id.*

When Plaintiff returned to Dr. Stuck on April 22, 2011, she reported that she had stopped taking prednisone for her vasculitis. Tr. at 416. She complained of focal pain in her left knee, but was scheduled to see Dr. Constable later in the day. *Id.* Dr. Stuck

found Plaintiff had diffuse muscle tenderness to palpation, but did not note any other musculoskeletal or neurological findings. Tr. at 417. She prescribed Cymbalta and provided a Toradol injection. *Id.*

Later that day, Dr. Constable found Plaintiff's left knee had tenderness, but normal range of motion, intact sensation, and no instability. Tr. at 412. An x-ray showed narrowing of the medial compartment. *Id.* Dr. Constable assessed left knee effusion and history of fibromyalgia. Tr. at 413. She attempted aspiration of Plaintiff's left knee, although without removal of any intra-articular synovial fluid. *Id.* Dr. Constable injected Plaintiff's knee with Depo-Medrol and Marcaine. *Id.*

### 3. Function Report

Plaintiff completed a function report on October 30, 2009, in which she stated that she was unable to walk at a normal pace and that all of her movements were hindered by pain. Tr. at 145. She reported that her ADLs consisted of getting up early to iron her husband's work clothes, washing clothes and dishes, sweeping, and other housework. Tr. at 140. However, she stated that by afternoon and evening, she was unable to function well at all and would then lie on the couch for the remainder of the day. *Id.*

### 4. Lay Witness Statement

In a letter dated August 25, 2009, Tammy Johnson, Plaintiff's supervisor since 2003, stated that Plaintiff required assistance moving around the building and was limited to a small area within her immediate department. Tr. at 125. Ms. Johnson stated that Plaintiff could not function as her peers when it came to walking throughout the building, standing during meetings or fire drills, or other situations that required extended physical

ability.  *Id.*  She also reported that there were a few occasions when Plaintiff's pain was so severe and unpredictable that Plaintiff needed a wheelchair, and she had to call Plaintiff's husband to pick her up.  *Id.*

C.      The Administrative Proceedings

1.      The Administrative Hearing

a.      Plaintiff's Testimony

At the hearing on August 3, 2011, Plaintiff testified that she lives with her husband, has her driver's license, and drives when necessary.  Tr. at 29–31.  She stated that she reduced her hours to part-time in July 2008 because she was having difficulty working five consecutive days in a row.  Tr. at 34.  She reported that her father had a stroke in July 2008 and that she sometimes helped her sister with his care by staying with her parents if her sister was not at the house.  Tr. at 34–35.  Plaintiff said she took a full retirement from her job in 2009.  Tr. at 32, 35.

Plaintiff testified that she had severe pain 80 percent of the time, and rated her pain at seven or eight out of 10.  Tr. at 36.  She stated she had pain over her entire body and that her left hip and right knee made it difficult for her to be up and about for extended periods of time.  *Id.*  She stated, however, that she had a pain level of two or three on the day of the hearing and that she had been feeling "fairly decent" for the several weeks prior to the hearing.  Tr. at 37.  Plaintiff reported she passed her time watching television while lying on the couch.  Tr. at 38–39.  She said that sitting for an extended period was very uncomfortable and that, on a bad day, she could sit for an hour

at a time before she needed to lie down. Tr. at 39–40. She stated that her husband did the grocery shopping. Tr. at 31.

b. Vocational Expert Testimony

Vocational Expert ("VE") Adger Brown reviewed the record and testified at the hearing. Tr. at 41. The VE categorized Plaintiff's PRW as a data entry specialist as semi-skilled, sedentary work. Tr. at 42. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could lift or carry no more than 20 pounds frequently and 10 pounds occasionally; should never stand and/or walk over four hours in an eight-hour workday; should never crawl or climb ladders or scaffolds; and should avoid hazards such as unprotected heights, vibration, and dangerous machinery. Tr. at 42. The VE testified that the hypothetical individual would be able to perform Plaintiff's PRW. *Id.* Upon questioning by Plaintiff's counsel, the VE stated that the hypothetical individual would be unable to perform substantial gainful activity if she could not sit or stand for more than two hours each in an eight-hour workday or had no ability to maintain concentration for an extended period of time. Tr. at 43–45.

2. The ALJ's Findings

In his August 18, 2011, decision, the ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2014.
2. The claimant has not engaged in substantial gainful activity since August 18, 2008, the alleged onset date (20 CFR 404.1571 *et seq.*).
3. The claimant has the following severe impairments: fibromyalgia; left hip pain; and degenerative changes at the L4–5 level (20 CFR 404.1520(c)).
4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part

404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.   After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform work with restrictions that require no lifting or carrying over 20 pounds occasionally and 10 pounds frequently; no standing and/or walking over 4 hours in an 8-hour workday; no crawling or climbing of ladders or scaffolds; and avoidance of hazards such as unprotected heights, vibration and dangerous machinery.

6.   The claimant is capable of performing past relevant work as a data entry clerk.  This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7.   The claimant has not been under a disability, as defined in the Social Security Act, from August 18, 2008, through the date of this decision (20 CFR 404.1520(f)).

Tr. at 14–19.

II.   Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)   The ALJ erred in failing to find Plaintiff's vasculitis to be a severe impairment;

2)   The ALJ improperly evaluated the opinion of Plaintiff's treating physician;

3)   The ALJ improperly discounted Plaintiff's credibility; and

4)   The ALJ erred in failing to consider lay evidence from Plaintiff's former work supervisor.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.      Legal Framework

    1.      The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[2] (4) whether such

---

[2] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

impairment prevents claimant from performing PRW;[3] and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82–62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v.*

---

[3] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

*Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

### 2. The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be

affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

      B.      Analysis

           1.      Vasculitis as a Severe Impairment

At step two, the ALJ found Plaintiff had the following severe impairments: fibromyalgia, left hip pain, and degenerative changes at the L4–5 level. Tr. at 14. Plaintiff contends that the ALJ erred in finding that her vasculitis was not a severe impairment. [Entry #8 at 6–7]. The Commissioner contends that substantial evidence supports the ALJ's determination that Plaintiff's vasculitis was a non-severe impairment and that a failure to find an impairment severe at step two of the sequential evaluation process is harmless as long as all impairments are considered in determining a claimant's RFC. [Entry #12 at 9–11].

A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). A non-severe impairment is defined as one that "does not significantly limit [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1521(a). A severe impairment "must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques. A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by your statement of symptoms[.]" 20 C.F.R. § 404.1508. It is the claimant's burden to prove that she suffers from a medically-severe impairment. *Bowen v. Yuckert*, 482 U.S. 137, 145 n.5 (1987).

In finding that Plaintiff's vasculitis was a non-severe impairment, the ALJ stated as follows:

> The claimant's vasculitis is a skin condition that was treated by Dr. Kathleen Flint. Examination on May 18, 2010, reflected the claimant was treated with corticosteroids and there were no signs or symptoms suggestive of any underlying disorder. On May 27, 2010, Dr. Flint indicated the claimant's vasculitis was improved with no overt signs or symptoms and there were no lab abnormalities noted. Ongoing treatment notes from Dr. Flint reflected the claimant's vasculitis improved with treatment.

Tr. at 14 (internal citations omitted).

Plaintiff first contends that the ALJ misconstrued the true nature of vasculitis by characterizing it as a "skin condition" when it is actually a disorder that causes inflammation of the blood vessels. [Entry #8 at 7]. The undersigned is not persuaded by this argument given that, when asked about Plaintiff's vasculitis during the administrative hearing, Plaintiff's counsel stated, "Your honor it's an, I guess, a skin condition my client has." Tr. at 28. Furthermore, Dr. Flint's records indicate that although Plaintiff's vasculitis rash did sting, it was more problematic from a cosmetic standpoint. Tr. at 399.

Plaintiff also generally argues that that ALJ should have found her vasculitis to be a severe impairment because her treatment records indicate that she has increased flares when she is on her feet for extended periods of time. [Entry #8 at 7]. While the records do indicate that Plaintiff's vasculitis flared after standing, the ALJ found that the records also demonstrated that the condition improved with medication and that Plaintiff had no signs or symptoms of an underlying disorder. Tr. at 14. Because the ALJ provided specific reasons for finding Plaintiff's vasculitis not to be severe and because those

reasons were supported by the medical records, the undersigned recommends a finding that the ALJ's finding on this issue is supported by substantial evidence.

Furthermore, to the extent that the ALJ may have erred in finding Plaintiff's vasculitis not to be severe, Plaintiff has suffered no harm. *See Mickles v. Shalala*, 29 F.3d 918, 921 (4th Cir. 1994) (affirming denial of benefits where the ALJ erred in evaluating a claimant's pain because "he would have reached the same result notwithstanding his initial error"). A finding of a single severe impairment at step two of the sequential evaluation is enough to ensure that the factfinder will progress to step three. *See Carpenter v. Astrue*, 537 F.3d 1264, 1266 (10th Cir. 2008) ("[A]ny error here became harmless when the ALJ reached the proper conclusion that [claimant] could not be denied benefits conclusively at step two and proceeded to the next step of the evaluation sequence."). The undersigned agrees with other courts that find no reversible error where the ALJ does not find an impairment severe at step two provided that he considers that impairment in subsequent steps. *See Washington v. Astrue*, 698 F. Supp. 2d 562, 580 (D.S.C. 2010) (collecting cases); *Singleton v. Astrue*, No. 9:08-1982-CMC, 2009 WL 1942191, at *3 (D.S.C. July 2, 2009). Here, the ALJ specifically considered Plaintiff's vasculitis in determining her RFC. Tr. at 17.

### 2.    Treating Physician Opinion

Plaintiff next argues the ALJ erred in discounting the opinions of Dr. Stuck. [Entry #8 at 8–10]. Plaintiff contends that Dr. Stuck's opinions were based on her long-standing treatment of Plaintiff and were supported by the objective medical evidence. *Id.*

The Commissioner responds that the ALJ properly weighed the evidence and reasonably declined to accord significant weight to Dr. Stuck's opinions. [Entry #12 at 11–14].

If a treating source's medical opinion is "well-supported and not inconsistent with the other substantial evidence in the case record, it must be given controlling weight[.]" SSR 96-2p; *see also* 20 C.F.R. §§ 404.1527(c)(2) (providing treating source's opinion will be given controlling weight if well-supported by medically-acceptable clinical and laboratory diagnostic techniques and inconsistent with other substantial evidence in the record); *see also Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (finding a physician's opinion should be accorded "significantly less weight" if it is not supported by the clinical evidence or if it is inconsistent with other substantial evidence). The Commissioner typically accords greater weight to the opinion of a claimant's treating medical sources because such sources are best able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. *See* 20 C.F.R. §§ 404.1527(c)(2). However, "the rule does not require that the testimony be given controlling weight." *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam). Rather, "[c]ourts evaluate and weigh medical opinions pursuant to the following non-exclusive list: (1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist." *Johnson*, 434 F.3d at 654. The ALJ has the discretion to give less weight to the opinion of a treating physician when there is "persuasive contrary evidence." *Mastro v. Apfel*, 270 F.3d, 171, 176 (4th Cir. 2001). In undertaking review of the ALJ's treatment of a

claimant's treating sources, the court focuses its review on whether the ALJ's opinion is supported by substantial evidence, because its role is not to "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Craig*, 76 F.3d at 589.

In December 2009, Dr. Stuck responded to questions from Plaintiff's long term disability carrier. Tr. at 292–93. The questionnaire suggests that Dr. Stuck had opined that Plaintiff could not perform part-time sedentary work. Tr. at 292. In support of his opinion, Dr. Stuck stated that Plaintiff had reported worsening pain in her shoulder, neck, lower back, and legs which was making her job more difficult. *Id.* Dr. Stuck further noted that there were no objective clinical findings to support Plaintiff's fibromyalgia symptoms. *Id.* Dr. Stuck also reported that Plaintiff remained on Lyrica and Tramadol, but her capacity to exercise had been limited by the development of degenerative changes in her knees. *Id.* In a letter dated April 30, 2010, Dr. Stuck stated Plaintiff was "totally and permanently disabled." Tr. at 291.

Opinions that a claimant is disabled or unable to work are reserved to the Commissioner and are not considered medical opinions. 20 C.F.R. §§ 404.1527(d). Pursuant to the regulations, the Commissioner will not give any special significance to the source of an opinion on an issue reserved to the Commissioner. *Id.* Thus, Dr. Stuck's opinions that Plaintiff could not perform part-time sedentary work and is totally and permanently disabled are not entitled to any special significance. The undersigned finds that the ALJ's failure to include this rationale for discounting Dr. Stuck's opinions in his decision was harmless error because the regulations are clear on this point. *See Mickles*

*v. Shalala*, 29 F.3d 918, 921 (4th Cir. 1994) (affirming denial of benefits where the ALJ erred in evaluating a claimant's pain because "he would have reached the same result notwithstanding his initial error").

As to the remainder of Dr. Stuck's opinions,[4] the ALJ properly explained his reasoning for discounting them. After setting forth a summary of the opinions, the ALJ did not give them any significant weight because he found they were "quite conclusory, providing very little explanation of the evidence relied on in forming the opinion." Tr. at 18. The ALJ noted that Dr. Stuck's response to Plaintiff's long-term disability carrier indicated there were no objective clinical findings for her fibromyalgia syndrome other than her reported worsening of pain in her shoulders, neck, low back, and legs. *Id.* Finally, the ALJ stated that Dr. Stuck's opinion that Plaintiff was totally and permanently disabled was based on Plaintiff's vasculitis, which the evidence demonstrates was improved with treatment. *Id.* In evaluating Plaintiff's RFC, the ALJ also referred to Dr. Stuck's medical records from 2010 reflecting no complaints of any symptoms and an essentially normal examination. *Id.* This reference demonstrates that the ALJ concluded that Dr. Stuck's opinions were not supported by her treatment records.

Because the ALJ provided specific reasons for discounting Dr. Stuck's limited opinions consistent with the factors enumerated in *Johnson*, 434 F.3d at 654, the

---

[4] It appears to the undersigned that Dr. Stuck's only opinion on issues other than those reserved to the Commissioner was that Plaintiff's ability to exercise was limited by degenerative changes in her knees. In support of his position that Plaintiff could not perform part-time sedentary work, Dr. Stuck referenced only Plaintiff's self-reported pain and further stated that there were no objective clinical findings to support her fibromyalgia symptoms. Tr. at 292. The undersigned considers these statements to be observations rather than opinions.

undersigned recommends a finding that the ALJ's decision to do so is supported by substantial evidence.

### 3. Credibility Determination

Plaintiff argues that the ALJ failed to properly evaluate her subjective pain complaints. *Id.* at 11. She more specifically argues that the ALJ committed reversible error by (1) failing to address the lay opinion of Plaintiff's former work supervisor, Tammy Johnson; and (2) failing to consider Plaintiff's long-standing work history.[5] [Entry #8 at 10, 12]. The Commissioner concedes that the ALJ failed to make a specific finding as to Ms. Johnson's lay testimony, but contends that any error in doing so was harmless. [Entry #12 at 16–17]. The Commissioner did not respond to Plaintiff's second argument.

Prior to considering a claimant's subjective complaints, an ALJ must find a claimant has an underlying impairment that has been established by objective medical

---

[5] Plaintiff also contends that, in assessing her credibility, the ALJ failed to consider the limitations imposed by vasculitis. [Entry #8 at 12]. This argument is more applicable to the ALJ's RFC determination than to the credibility determination. As noted above, the ALJ provided specific reasons for finding Plaintiff's vasculitis to be a non-severe impairment. Tr. at 14. The reasons provided by the ALJ also support his decision to limit Plaintiff to employment requiring no standing and/or walking over four hours in an eight-hour workday. Thus, the undersigned does not find any error in the ALJ's consideration of Plaintiff's vasculitis in determining her RFC. In addition, and also in support of her argument that the ALJ's credibility analysis was flawed, Plaintiff contends that the ALJ's "failure to take into account Claimant's continued work while under Dr. Stuck's care demonstrates that the credibility finding did not apply the appropriate pain standard under Fourth Circuit law." [Entry #8 at 12]. Plaintiff fails to explain this argument or provide any record or legal citations in support. Furthermore, from a logical standpoint, Plaintiff's ability to continue to working while being treated for fibromyalgia seems to support the ALJ's ultimate finding of non-disability. For these reasons, the undersigned does not find Plaintiff's argument persuasive in demonstrating that the ALJ erred in his credibility determination.

evidence that would reasonably be expected to cause subjective complaints of the severity and persistence alleged. *See* 20 C.F.R. § 404.1529; SSR 96-7p; *Craig*, 76 F.3d 585, 591–96 (4th Cir. 1996) (discussing the regulation-based two-part test for evaluating pain). The first part of the test "does not . . . entail a determination of the intensity, persistence, or functionally limiting effect of the claimant's asserted pain." 76 F.3d at 594 (internal quotation omitted). Second, and only after claimant has satisfied the threshold inquiry, the ALJ is to evaluate "the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work." *Id.* at 595. This second step requires the ALJ to consider the record as a whole, including both objective and subjective evidence, and SSR 96-7p cautions that a claimant's "statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence." SSR 96-7p, ¶ 4.

If an ALJ rejects a claimant's testimony about her pain or physical condition, he must explain the bases for such rejection to ensure that the decision is sufficiently supported by substantial evidence. *Hatcher v. Sec'y, Dep't of Health & Human Servs.*, 898 F.2d 21, 23 (4th Cir. 1989). "The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p, ¶ 5. In evaluating the intensity, persistence, and limiting effects of an individual's symptoms and the extent to which they limit an individual's

ability to perform basic work activities, adjudicators are to consider all record evidence, which can include the following: the objective medical evidence; the individual's ADLs; the location, duration, frequency, and intensity of the individual's pain or other symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; any measures other than treatment the individual uses to relieve pain or other symptoms; and any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. SSR 96-7p.

Here, after setting forth the applicable regulations, the ALJ considered Plaintiff's subjective claims under the required two-step process. *See Craig*, 76 F.3d at 591–96. The ALJ found Plaintiff's impairments could reasonably be expected to cause some of the symptoms she alleged, but determined that Plaintiff's testimony "concerning the intensity, persistence and limiting effects" of her symptoms was "not credible to the extent" the testimony was inconsistent with the ALJ's determination of her RFC. Tr. at 16.

In discounting Plaintiff's credibility, the ALJ noted that Plaintiff was diagnosed with fibromyalgia in 2003, but continued to work at her sedentary job until August 2009. Tr. at 18. He further noted that Plaintiff's medical records did not document the limited ADLs she alleged, demonstrated lengthy treatment gaps, documented that she physically cared for her elderly father in 2008, and indicated that her medications were effective in

controlling her symptoms. *Id.* The ALJ also referenced normal objective findings in Plaintiff's medical records. *Id.*

Plaintiff does not challenge the reasons offered by the ALJ in discounting her credibility. Instead, she argues that he erred in failing to consider her long work history and Ms. Johnson's statement. In support of her argument regarding her work history, Plaintiff cites to no authority requiring an ALJ to include such a consideration in his decision. While the ALJ could have considered Plaintiff's work history in assessing her credibility, the undersigned does not find that his failure to do so constitutes reversible error. The undersigned further concludes that the reasons cited by the ALJ in discounting Plaintiff's credibility provided substantial evidence for the determination.

The crux of Plaintiff's credibility argument is that the ALJ's failure to consider Ms. Johnson's statement resulted in a flawed analysis. Pursuant to SSR 96-7p, in determining the credibility of a claimant's statements, the ALJ must consider the entire case record including statements from "other persons about the symptoms and how they affect the individual." SSR 96-7p. Other persons may include non-medical sources such as spouses, parents, caregivers, siblings, other relatives, friends, neighbors, and clergy. 20 C.F.R. § 404.1513(d). These lay witnesses "may provide [statements] about how the symptoms affect [a claimant's] activities of daily living and [her] ability to work. . . ." 20 C.F.R. § 404.1529(a). Where a lay witness's testimony merely repeats the allegations of a plaintiff's own testimony and is likewise contradicted by the same objective evidence discrediting the plaintiff's testimony, specific reasons are not necessary for dismissing the lay witness's testimony. *See Lorenzen v. Chater*, 71 F.3d 316, 319 (8th Cir. 1995);

*Carlson v. Shalala*, 999 F.2d 180 (7th Cir. 1993); *Robinson v. Sullivan*, 956 F.2d 836, 841 (8th Cir. 1992); *Vincent v. Heckler*, 739 F.2d 1393, 1395 (9th Cir. 1984).

In a letter dated August 25, 2009, Ms. Johnson stated that she supervised Plaintiff from July 2003 until August 2009, during which time Plaintiff's "health was a continuous challenge . . ., but her work habits, knowledge of the system, and her professionalism were a true asset to [the] agency."  Tr. at 125.  Ms. Johnson stated that Plaintiff required assistance moving around the building and from her handicapped parking spot.  *Id.*  She also stated that Plaintiff was limited to a small area within her immediate department.  *Id.*  Ms. Johnson stated that Plaintiff could not function as her peers when it came to walking throughout the building, standing during meetings or fire drills, or other situations that required extended physical ability.  *Id.*  She reported that there were a few occasions when Plaintiff's pain was so severe and unpredictable that Plaintiff needed a wheelchair, and she had to call Plaintiff's husband to pick her up.  *Id.*

Ms. Johnson's statement does not speak to any difficulties or limitations Plaintiff experienced in actually performing her job.  Rather, the statement identifies mobility-related difficulties consistent with Plaintiff's alleged problems with standing and walking.  It does not appear, however, that these difficulties interfered with Plaintiff's ability to perform her sedentary job.  In addition, the statement provides that Plaintiff's pain was only severe enough for her to leave work early on "a few occasions" over a six-year period.  Because the ALJ cited to substantial evidence, including objective clinical findings, in discounting Plaintiff's subjective complaints and those complaints were similar to the limitations outlined by Ms. Johnson, the undersigned recommends a finding

that it was not necessary for the ALJ to provide specific reasons for dismissing Ms. Johnson's statement. *Lorenzen*, 71 F.3d at 319. On this basis, the undersigned further recommends a finding that the ALJ did not err in his credibility determination.

III.     Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the Commissioner, but to determine whether her decision is supported as a matter of fact and law. Based on the foregoing, the undersigned recommends the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

October 29, 2013                              Shiva V. Hodges
Columbia, South Carolina             United States Magistrate Judge

**The parties are directed to note the important information in the attached "Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).